## UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

OLD FORGE SCHOOL DISTRICT,

Plaintiff,

v.

META PLATFORMS, INC., FACEBOOK HOLDINGS, LLC, FACEBOOK OPERATIONS, LLC, META PAYMENTS INC., META PLATFORMS TECHNOLOGIES, LLC, INSTAGRAM, LLC, SICULUS, INC., SNAP INC., TIKTOK INC., TIKTOK LTD., TIKTOK LLC, BYTE DANCE INC., BYTE DANCE LTD., ALPHABET INC., XXVI HOLDINGS INC., GOOGLE LLC, and YOUTUBE, LLC,

Defendants.

Case No. 3:26-cv-643

**COMPLAINT**

JURY TRIAL DEMANDED

FILED
SCRANTON

MAR 13 2026

PER _____
DEPUTY CLERK

i

Plaintiff, the Old Forge School District of Lackawanna County, Pennsylvania, brings this action against the following Defendant Social Media Companies and their affiliates and subsidiaries: Meta Platforms, Inc.; Facebook Holdings, LLC; Facebook Operations, LLC; (collectively referred to as "Facebook"); Meta Payments Inc.; Meta Platforms Technologies, LLC; Instagram, LLC ("Instagram"); Siculus, Inc. (collectively, Facebook, Instagram, and Siculus Inc. are referred to as "Meta"); Snap Inc. ("Snapchat"); TikTok Inc.; TikTok Ltd.; TikTok LLC; Byte Dance Inc.; Byte Dance Ltd. (collectively, the TikTok and Byte Dance entities are referred to as "TikTok"); Alphabet Inc.; XXVI Holdings Inc.; Google LLC; and YouTube, LLC (collectively, the Alphabet, XXVI, Google, and YouTube entities are referred to as "YouTube") (collectively, "Defendants" or "Defendant Social Media Companies").

i

## I.  NATURE OF THE ACTION

1.  Like never before in recent history have our youths been thrust into the midst of such serious a mental health crisis as they are today. Even more disturbing, the Defendant Social Media Companies knowingly caused that crisis, in their ruthless quest for profits at any cost, with callous disregard for the harm their platforms cause to minors' mental and behavioral health.

2.  Over the last two decades, in schools across the country, including within Old Forge School District, an astounding number of adolescents have begun to suffer from poor mental health and behavioral disorders. Indeed, according to the CDC, "[b]etween 2007 and 2018, the national suicide rate among persons aged 10-24 increased 57.4%."[1]

3.  In 2021, the U.S. Surgeon General issued an advisory alerting the public that "[r]ecent national surveys of young people have shown alarming increases in the prevalence of certain mental health challenges" and that "[i]n 2019 one in three high school students and half of female students reported persistent feelings of sadness or hopelessness, an overall increase of 40% from 2009."[2]

4.  Recognizing the dire state of our youth's mental health, the American Academy of Pediatrics, the American Academy of Child and Adolescent Psychiatry, and the Children's Hospital Association have recently declared a national emergency.[3]

5.  The dramatic rise of young people experiencing mental health issues tracks directly, in lockstep, with the dramatic rise in the number of young people using the Defendants' social media platforms. Identifying minors as easy prey and recognizing the huge financial upside of

---

[1] Sally C. Curtin, M.A., State Suicide Rates Among Adolescents and Young Adults Aged 10-24: Untied States, 2000-2018, CDC (Sept 11, 2020), https://www.cdc.gov/nchs/data/nvsr/nvsr69/nvsr-69-11-508.pdf.

[2] Protecting Youth Mental Health, U.S. Surgeon General Advisory (Apr. 11, 2023), https://www.hhs.gov/sites/default/files/surgeon-general-youth-mental-health-advisory.pdf.

[3] AAP-AACAP-CHA Declaration of a National Emergency in Child and Adolescent Mental Health, Am. Acad. Pediatrics (Oct. 19, 2021), https://www.aap.org/en/advocacy/child-and-adolescent-healthy-mental-development/aap-aacap-cha-declaration-of-a-national-emergency-in-child-and-adolescent-mental-health/.

capturing their attention, the Defendants set their sights on the vulnerable, still-developing brains of minors, to make them chronically habitual users of their social media platforms. The Defendants' success is readily apparent; just look at the millions of youths currently hooked on social media, forever gazing down at their cell phones, trapped in endless "feedback loops" and manipulated by a host of other, algorithmically driven "features" of the Defendants' social media platforms. All so the Defendants' can simultaneously capture an obscene amount of advertising dollars — Mission Accomplished.

6.    Research shows 90% of children ages 13-17 use social media.[4]  Even younger children regularly use social media, with studies showing 38% of children ages 8-12,[5] 49% of children ages 10-12, and even 32% of children ages 7-9 all using social media.[6]

7.    To continually increase revenue, Defendants deliberately design and operate their platforms to maximize users' screen time. Defendants accomplish this by deploying features intended to exploit human psychology with complex algorithms driven by advanced artificial intelligence and machine-learning systems.

8.    As part of their eternal quest for profits, Defendants exploit young users' still-developing decision-making capacity, impulse control, emotional maturity, and poor psychological resiliency.

9.    According to the National Institute of Mental Health, "[a]dolescence is an important time for brain development" and such "[b]rain development is related to *social experiences* during adolescence."[7]

---

[4] Social Media and Teens, Am. Acad. of Child & Adolescent Psychiatry (March 2018) https://www.aac ap.org/AACAP/Families_and_Youth/Facts_for_Families/FFF-Guide/Social-Media-and-Teens-100.aspx.
[5] Victoria Rideout et al., *The Common Sense Census: Media Use by Tweens and Teens*, 2021 at 5, Common Sense Media (2022), https://www.commonsensemedia.org/sites/default/files/research/report/8-18-census-integrated-report-final-web_0.pdf.
[6] *Sharing Too Soon? Children and Social Media Apps*, C.S. Mott Children's Hosp. Univ. Mich. Health (Oct. 18, 2021), https://mottpoll.org/sites/default/files/documents/101821_SocialMedia.pdf.
[7] *The Teen Brain: 7 Things to Know*, Natl. Institute of Mental Health, NIH Publication No. 23-MH-8078, U.S. Dep't of

10. For today's adolescents, those traditional face-to-face "social experiences" have been intentionally replaced by chiming chat windows and profile pictures via the Defendant Social Media Companies' platforms, which were designed, in part, by their in-house psychologists. Naturally then, only the Defendants could have foreseen the unprecedented mental health crisis that would plague a new generation of adolescents, who largely or exclusively only interacted with others via such social media platforms.

11. Despite knowing that minors are much more likely to suffer serious psychological harm from social media, Defendants still seek to grow their user-base of minors by employing designs, algorithms, and policies that promote addiction and other severe mental harms—while also thwarting parents' ability to limit their children's social media use. Take almost any teenager's cell phone away from them abruptly, and his or her reaction will differ only in scale to that of an addicted drug user.

12. After-the-fact reports and studies show that the results of Defendants' actions have a detrimental effect on minors' mental health as "[t]here is a substantial link to depression, and that link tends to be stronger among girls" and "[t]he same is true for self-harm, . . . '[t]he more hours a day she spends using social media, the more likely she is to engage in self-harm behaviors—the link is there for boys as well.'"[8] Moreover, "[m]ost of the large studies show that heavy users of social media are about twice as likely to be depressed as light users."[9]

13. In fact, the Surgeon General has linked social media's relentless focus on profits over safety to the youth mental health crisis, stating that social media's "[b]usiness models are often built around maximizing user engagement as opposed to safeguarding users' health and

---

Health and Human Services, Natl. Institutes of Health (2023) (emphasis added), https://www.nimh.nih.gov/health/publications/the-teen-brain-7-things-to-know#part_11021.

[8] Jennifer A. Kingson, *Social media's effects on teen mental health comes into focus*, Axios (Jan. 11, 2023), https://www.axios.com/2023/01/11/social-media-children-teenagers-mental-health-tiktok-meta-facebook-snapchat.

[9] *Id.*

ensuring that users engage with one another in safe and healthy ways."[10] President Biden recently reiterated this conclusion, asserting in his recent 2023 State of the Union address that "social media companies" must be held "accountable for the experiment they are running on our children for profit."[11]  There is no question that children are facing a growing mental health crisis of epidemic proportions. And likewise, there is no doubt that Defendants are the cause of that crisis.

14.    Plaintiff seeks to hold Defendants responsible for the harms their conduct inflicts on minors by purposefully preying on those most vulnerable users of social media.

15.    The Plaintiff, like every school district tasked to protect its student body, has been thrust into battle effectually unarmed to fight the mental health crisis infecting its students, against the Goliath corporate Defendants who continue to prey them.

16.    Indeed, the Plaintiff, like most every local school district, must spend increasing and often unattainable resources by diverting other allocated funds to quell the immediate threat. As first responders, the Plaintiff and other schools must take action to alleviate the rising rates of suicidal ideation, depression, anxiety, and other tragic symptoms of the public mental health crisis affecting their students.

17.    School districts such as the Plaintiff, bear the direct consequences of Defendants' detrimental actions towards young people, as the students of Old Forge School District have been and continue to be seriously impacted by this ongoing adolescent mental health crisis.

18.    In the 2023-2024 school year, there were approximately one thousand (1000) students enrolled in Old Forge School District. Defendants' daily unlawful conduct exposes those students to a great potential for significant harm and in fact has caused such harm.

19.    Shockingly, in a 2023 survey, 22.1% of sixth-grade students of the Old Forge

---

[10] Protecting Youth Mental Health, supra note 2.
[11] *Remarks of President Joe Biden – State of the Union Address as Prepared for Delivery*, White House (Feb. 7, 2023), https://www.whitehouse.gov/briefing-room/speeches-remarks/2023/02/07/remarks-of-president-joe-biden-state-of- the-union-address-as-prepared-for-delivery/.

School District admitted to "cutting" to various degrees, along with 23.7% of their eighth-grade counterparts.[12] During that same year, 35.7% of sixth-grade students attending Old Forge School District reported feelings of significant depressed, along with  35.3% of their eighth-grade counterparts, 20% of students in tenth grade,  and an alarming 41.7% of all twelfth-grade students.[13] Those same four demographics reported experiencing cyberbullying, via social media, at a heart-wrenching average rate of 58%.[14] Some of those cyberbullying victims also admitted to engaging in self-harm as a direct result.[15] Other students of Old Forge School District admitted to acting out in school, threatening or harming other students or staff, based on a social media meme or "challenge" appearing on their feed around at that time.[16]

20.    The severe impact of the youth mental health crisis, created by Defendants and suffered by the Plaintiff's students, has impacted Plaintiff's ability to provide adequate social and mental health services to its students.

21.    Additionally, the youth mental health crisis is infecting all aspects of education and the ability of young people to participate productively as members of their local communities for experiencing rates of anxiety, depression, and other mental health issues because of Defendants' intentional conduct. These children and adolescents perform worse in school, are less likely to attend school, and are more likely to engage in substance use and act out negatively in their local community, all of which directly affects Plaintiff's ability to provide a safe environment and fulfill its educational mission.

22.    The sharp rise in youth mental health problems interferes with Plaintiff's ability to

---

[12] *2023 Pennsylvania Youth Survey: Lackawanna County*, Pa. Comm'n Crime & Delinquency, Pa. Dep't of Drug & Alcohol Progs., Pa. Dep't Educ.(2023), https://www.pccd.pa.gov/JuvenileJustice/Documents/2023%20PAYS/2023%20 County%20Reports/Lackawanna%20County%20Profile%20Report.pdf.
[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] Id.

provide a safe learning environment and adequate student services; Plaintiff requires significantly more funding to fight the internalized effects of the Defendants' constant bombardment of young brains during this social experiment that Defendants first launched some 13 years ago.

23. Plaintiff needs immediate funding to develop a long-term plan to deal with that mental health crisis, considering the record rates of depression, anxiety, suicidal ideation, and other tragic byproducts of the Defendants' platforms. Defendants should be held responsible for their continued use of algorithms, features, and policies that target minors, knowing that their high-tech tactics are harming such minors, including those under the Plaintiff's care .

24. Despite knowing they fueled that youth mental health crisis, Defendants have not provided remediation to Plaintiff or other schools similarly facing that crisis.

## II.      JURISDICTION AND VENUE

25. This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000.00 and Plaintiff and Defendants are residents and citizens of different states.

26. The Court has personal jurisdiction over Defendants because they do business in the Middle District of Pennsylvania and have sufficient minimum contacts with the District. Defendants intentionally avail themselves of the markets in this State through the promotion, marketing, and operation of their platforms at issue in this lawsuit in Pennsylvania, and by retaining the profits and proceeds from these activities, rendering the exercise of jurisdiction by this Court permissible under Pennsylvania law and the United States Constitution.

27. Venue in this Court is proper under 28 U.S.C. §§ 1391(b)(2) and (3) because a substantial part of the events or omissions giving rise to the claims within this Complaint arose in this District, and Defendants are subject to the Court's personal jurisdiction for this action.

## III.    PARTIES

### A.    Plaintiff

28.    Plaintiff is the Old forge School District of Lackawanna County, Pennsylvania.

### B.    Meta Defendants

29.    Defendant Meta Platforms, Inc. ("Meta"), formerly known as Facebook, Inc., is a Delaware corporation with its principal place of business in Menlo Park, California. Defendant Meta develops and maintains social media platforms, communication platforms, and electronic devices that are widely available to users throughout the United States. The platforms developed and maintained by Meta include Facebook (including its self-titled app, Marketplace, and Workplace), Messenger (including Messenger Kids), Instagram, and a line of electronic virtual reality devices and services called Meta Quest (collectively, "Meta platforms").

30.    Meta transacts or has transacted business in this District and throughout the United States. At all times material to this Complaint, acting alone or in concert with its subsidiaries (identified below), Meta has advertised, marketed, and distributed the Meta platforms to consumers throughout the United States. At all times material to this Complaint, Meta formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.

31.    Defendant Meta's subsidiaries include: Facebook Holdings, LLC; Facebook Operations, LLC; Meta Payments, Inc.; Meta Platforms Technologies, LLC; Instagram, LLC; and Siculus, Inc.

32.    Defendant Facebook Holdings, LLC ("Facebook Holdings") was organized under the laws of the state of Delaware on March 11, 2020, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook Holdings is primarily a holding company for entities involved in Meta's supporting and international endeavors, and its principal place of business is in Menlo Park,

California. Defendant Meta is the sole member of Facebook Holdings.

33.   Defendant Facebook Operations, LLC ("Facebook Operations") was organized under the laws of the state of Delaware on January 8, 2010, and is a wholly owned subsidiary of Meta Platforms, Inc. The principal place of business of Facebook Operations is in Menlo Park, California. Defendant Meta is the sole member of Facebook Operations.

34.   Defendant Meta Payments, Inc. ("Meta Payments") was incorporated in Florida on December 10, 2010, as Facebook Payments Inc. In July 2022, the entity's name was amended to Meta Payments, Inc. Meta Payments is a wholly owned subsidiary of Meta Platforms, Inc. Meta Payments manages, secures, and processes payments made through Meta, among other activities, and its principal place of business is in Menlo Park, California.

35.   Defendant Meta Platforms Technologies, LLC ("Meta Technologies") was organized under the laws of the state of Delaware as "Oculus VR, LLC" on March 21, 2014, and acquired by Meta on March 25, 2014. In November 2018, the entity's name was amended to Facebook Technologies, LLC. In June 2022, the entity's name was amended again, this time to Meta Platforms Technologies, LLC. Meta Technologies develops Meta's virtual and augmented reality technology, such as the Meta Quest line of services, among other technologies related to Meta's platforms, and its principal place of business is in Menlo Park, California. Defendant Meta is the sole member of Meta Technologies.

36.   Defendant Instagram, LLC ("Instagram") was founded by Kevin Systrom and Mike Krieger in October 2010. In April 2012, Meta purchased the company for approximately $1 billion. Meta reformed the limited liability company under the laws of the state of Delaware on April 7, 2012, and the company's principal place of business is in Menlo Park, California. Defendant Meta is the sole member of Instagram.

37.   Defendant Siculus, Inc. ("Siculus") was incorporated in Delaware on October 19,

8

2011. Siculus is a wholly owned subsidiary of Meta, which supports Meta platforms by constructing data facilities and other projects. Siculus's principal place of business is in Menlo Park, California.

### C.    Snap Defendant

38.    Defendant Snap Inc. ("Snap") is a Delaware corporation with its principal place of business in Santa Monica, California. Snap transacts or has transacted business in this District and throughout the United States. At all times material to this Complaint, acting alone or in concert with others, Snap has advertised, marketed, and distributed the Snapchat social media platform to consumers throughout the United States. At all times material to this Complaint, Snap formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.

### D.    TikTok Defendants

39.    Defendant TikTok Ltd. wholly owns its subsidiary Defendant TikTok LLC ("TikTok LLC") which is, and at all relevant times was, a Delaware limited liability company.

40.    TikTok LLC wholly owns its subsidiary Defendant TikTok Inc. f/k/a Musical.ly, Inc. ("TikTok Inc.).

41.    TikTok Inc. was incorporated in California on April 30, 2015, with its principal place of business in Culver City, California. TikTok Inc. transacts or has transacted business in this District and throughout the United States. At all times material to this Complaint, acting alone or in concert with others, TikTok Inc. has advertised, marketed, and distributed the TikTok social media platform to consumers throughout the United States. At all times material to this Complaint, acting alone or in concert with Byte Dance Inc., TikTok Inc. formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.

42.    Defendant Byte Dance Ltd. ("Byte Dance Ltd.") is a global company incorporated

in the Cayman Islands. Its principal place of business is in Beijing, China. Byte Dance Ltd. also maintains offices in the United States, Singapore, India, and the United Kingdom, among other locations. Byte Dance Ltd. wholly owns its subsidiary Defendant Byte Dance Inc.

43.    Byte Dance Inc. ("Byte Dance") is a Delaware corporation with its principal place of business in Mountain View, California. Byte Dance transacts or has transacted business in this District. At all times material to this Complaint, acting alone or in concert with others, Byte Dance has advertised, marketed, and distributed the TikTok social media platform to consumers throughout the United States. At all times material to this Complaint, acting alone or in concert with TikTok Inc., Byte Dance formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.

### E.    YouTube Defendants

44.    Defendant Alphabet Inc. is a Delaware corporation with its principal place of business in Mountain View, California. Alphabet Inc. is the sole stockholder of XXVI Holdings.

45.    Defendant XXVI Holdings Inc. is a Delaware corporation with its principal place of business in Mountain View, California. XXVI Holdings, Inc. is a wholly owned subsidiary of Alphabet Inc. and the managing member of Google LLC ("Google").

46.    Defendant Google LLC is a limited liability company organized under the laws of the state of Delaware, and its principal place of business is in Mountain View, California. Google LLC is a wholly owned subsidiary of XXVI Holdings Inc., and the managing member of YouTube, LLC. Google LLC transacts or has transacted business in this District and throughout the United States. At all times material to this Complaint, acting alone or in concert with others, Google LLC has advertised, marketed, and distributed its YouTube video sharing platform to consumers throughout the United States. At all times material to this Complaint, acting alone or in concert with YouTube, LLC, Google LLC formulated, directed, controlled, had the authority to

10

control, or participated in the acts and practices set forth in this Complaint.

47.   Defendant YouTube, LLC is a limited liability company organized under the laws of the state of Delaware, and its principal place of business is in San Bruno, California. YouTube, LLC is a wholly-owned subsidiary of Google LLC. YouTube, LLC transacts or has transacted business in this District and throughout the United States. At all times material to this Complaint, acting alone or in concert with Defendant Google LLC, YouTube, LLC has advertised, marketed, and distributed its YouTube social media platform to consumers throughout the United States. At all times material to this Complaint, acting alone or in concert with Google LLC, YouTube, LLC formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.

## IV.   **FACTUAL BACKGROUND**

48.   Exponentially increasing their user-bases from millions to billions over the past decade, the Defendants are reaping billions of dollars in profit from advertising to such a wide audience, including a large swath of America's youth.

49.   Young people are particularly prevalent social media users and are thus seen as Defendants' most valuable commodities. This is borne out by minors' access to and use of social media, as 95% of teenagers aged 13-17 have cell phones[17] and 90% use social media.[18]   Studies also show that even younger children have widespread social media use.[19]

50.   To obtain such a virulent spread across America's youth, Defendants utilize intentional design choices and operational methods to keep young audiences captive once users log in to their platforms. Researchers studying the effect of social media on the brain have shown that social media platforms exploit "the same neural circuitry" as "gambling and recreational

---

[17] Emily Vogels et al., *Teens, Social Media and Technology 2022*, Pew Rsch. Ctr. (Aug. 10, 2022), https://www.pewresearch.org/internet/2022/08/10/teens-social-media-and-technology-2022/.
[18] Social Media and Teens, *supra* note 4.
[19] Sharing Too Soon? Children and Social Media Apps, *supra*, note 6.

drugs to keep consumers using their products as much as possible."[20]

**A.    The Design and Operation of Meta's Social Media Platforms are Purposefully Manipulative and Addictive**

51.    Defendant Meta operates multiple social media platforms, including Facebook and Instagram, which substantially contribute to the ongoing youth mental health crisis.

52.    Meta's platforms are designed to create dangerous experiences for users by systematically exposing each user to tailored content that is designed to promote repetitive and addictive use of Meta's social media platforms. This experience is designed to promote maximum user engagement with the platform, regardless of the dire consequences such engagement has on the user's mental health and overall well-being, rendering Defendants' social media platforms inherently dangerous, particularly when used by teens and children.

53.    Both the Facebook and Instagram platforms push a "feed" to users. But importantly, the "feed" does not consist only of material posted by accounts that the user has chosen to follow. Rather, it also includes substantial volumes of material specifically selected and promoted by Meta, as well as advertising. Meta's algorithms and designs drive user experience, not the user's choices.

54.    Defendants are able to collect more advertising revenue the longer users stay on their platforms. Defendants are thus incentivized to keep users engaging with their platforms by any means necessary. Sending "push" notifications to one's "feed" is tantamount to algorithmically force-feeding susceptible young minds to keep them scrolling the endless loop of content specifically chosen by the programmers' brainchild to prompt them to do just that.

---

[20] Jena Hilliard et al., *Social Media Addiction*, Addiction Ctr. (Apr. 3, 2023), https://www.addictioncenter.com/drugs/social-media addiction/#:~:text=Due%20to%20the%20effect%20that,when%20taking%20an%20addictive%20substance.

55.    In order to maximize user engagement and advertising profits from showing ads to users, Meta promotes harmful and/or unhealthy user experiences. Meta is aware of these inherently dangerous features and has repeatedly refused to change them or implement readily available and relatively inexpensive safety measures, opting instead to continually increase its user base, user engagement, and bottom line. Meta's own analysis recognizes simple solutions that could be effective, but Meta refused to implement known tools that could alleviate the harm caused by its social media platforms.[21]

56.    Moreover, Meta fails to take basic precautions that could protect the hundreds of thousands of minors using its social media platforms. For instance, Meta allows individuals to have multiple accounts, does not require a user to verify one's age, identity, or email address. Such failures exacerbate the harm Meta's social media platforms cause by making it impossible to avoid unwanted interactions. Users can open accounts as fast as those accounts can be blocked and when coupled with the excessive and addictive usage habits that Meta promotes among teens, such features create a perfect storm for waves of depression, anxiety, self-harm, and suicide.

57.    Additionally, Meta not only knows that underage users access its platforms , but it deliberately designed such platforms to evade parental authority and consent, including but not limited to Meta's failure to verify age and identity, provision of multiple accounts, marketing aimed at informing minors that they can open multiple accounts, failure to provide a point of contact for parents to notify Meta of lack of consent, marketing aimed at children that encourages children to use Meta's social media platforms without consent, and multiple other features and conduct by Meta aimed at ensuring young users have a means to access Meta's social media platforms no matter the circumstances.

---

[21] *Teen Girls Body Image and Social Comparison on Instagram—An Exploratory Study in the U.S.* at 40, WSJ (Sept. 29, 2021), https://s.wsj.net/public/resources/documents/teen-girls-body-image-and-social-comparison-on- instagram. pdf.

13

58.    Such practices, along with Meta's harmful platform designs, caused serious harm to the children and teens in Plaintiff's school district, forcing the Plaintiff to expend substantial resources to address the growing mental health challenges of its students.

### 1.    Meta's Facebook is Purposefully Manipulative and Addictive

59.    Facebook is an online social network that is part of the Meta Platforms.

60.    Facebook is currently the largest social network in the world with approximately 2 billion daily users of as 2022.[22]

61.    When it was founded in 2004, only a few college and university students could use the social media platform, which required users to verify their college enrollment.

62.    In 2005, Facebook expanded and became accessible to students at twenty-one universities in the United Kingdom and others around the world. Meta then launched a high school version of Facebook, which Meta CEO and majority shareholder, Mark Zuckerberg, referred to as the next logical step. Even then, however, high school networks required an invitation to join.

63.    Facebook later expanded eligibility to employees of several companies, including Apple Inc. and Microsoft. On December 11, 2005, Facebook added universities in Australia and New Zealand to its network and, in September 2006, Facebook opened itself up to everyone. While Facebook claimed that it was open only to persons aged 13 and older, with a valid email address, on information and belief, Facebook decided not to require email, age, or identity verification, granting underage users easy access to Facebook; so long as one was old enough to type in any random email address, young users had unfetter access to Facebook.

64.    Meta's history as a closed platform was limited to only specific users over the age of 18, and then over the age of 13, demonstrates that Meta knows how to implement design features meant to restrict access to persons below a certain age. Nonetheless, Meta made a deliberate

---

[22] Stacy Jo Dixon, *Number of Daily Active Facebook Users Worldwide as of 4th Quarter 2022 (in Millions)*, Statista (Feb. 13, 2023), https://www.statista.com/statistics/346167/facebookglobal-dau.

decision in 2006 to distribute its platform to everyone in the world with internet access, including minors, without considering the consequences of this affirmative choice.

65.    At the same time Facebook was expanding its platform, it also implemented a series of changes to its design to increase user engagement with the platform and promote platform growth including: (1) launching the "like" button; (2) creating a direct messaging service; (3) changing its newsfeed algorithm to determine what content to show users; and (4) creating content for users to post on its platform.

66.    These design changes, while profit maximizing for Facebook, had damaging consequences for Facebook's young users.

67.    For example, Facebooks' implementation of a feed and the "like" button increase social comparison pressure and publicly visible social metrics, such as "likes," turn social interaction into a competition, in ways that are particularly harmful to adolescents. Moreover, adolescents' under-developed ability to self-regulate means they are particularly vulnerable to the dopamine spikes caused by these external stimuli that activate the brain's reward system.[23] Meta is well-aware of the harm of its "like" feature, as indicated by the employees who helped create the feature going on to publicly decried it and note its harmful effects, after leaving the company.[24]

68.    Additionally, Facebook's messaging system is harmful to underage users because it creates damaging and dangerous interactions for minors. In Facebook's integrated direct messaging application, minors can encounter unwanted and harmful interactions such as bullying and sexual exploitation. The message application also makes children vulnerable to unsupervised interactions with adults who may be predators or bad actors.

---

[23] Nino Gugushvili et al., Facebook use intensity and depressive symptoms: a moderated mediation model of problematic Facebook use, age, neuroticism, and extraversion at 3, BMC Psych. 10, 279 (2022), https://doi.org/10.11/s40359-022-00990-7.

[24] See, e.g., Paul Lewis, 'Our minds can be hijacked': the tech insiders who fear a smartphone dystopia, The Guardian (Oct. 6, 2017), https://www.theguardian.com/technology/2017/oct/05/smartphone-addiction-silicon-valley-dystopia.

69. Facebook also designed and implemented harmful algorithms. For instance, Facebook uses algorithmic data mining that is able to pair users with whatever experience will maximize their engagement with its platform. Facebook directs users to the experiences that will maximize their engagement even if it exposes children and teens to harmful and destructive content. For instance, the algorithmic data may tailor a Facebook feed for a young girl with body image issues to show pro-anorexia content or may tailor a feed for a child struggling with depression to show pro-suicide content. Facebook has also designed and implemented a group recommendation algorithm that directs all users, including minors, to harmful groups that they would not have been exposed to but for Facebook's programming choices.

70. Facebook also creates content, including images and GIFs, and licenses thousands of hours of music, for users to use in videos they share on Facebook. These features are designed to encourage minors to post on Facebook ,which will in turn increase user engagement.

71. In addition to these harmful  app features, Facebook uses push notifications and emails which create addictive behavior. These features make individuals compelled to return to Facebook's platform. Moreover, Facebook sends such notifications at all hours of the day, meaning minors receive notifications even when they should be sleeping or in school.

72. Facebook's privacy settings and default profile settings are also harmful to minors. An individual's Facebook profile may be public or private. On a public profile, any Facebook user can view the photos, videos, and other content posted by the user with a public profile, whereas, on a private profile, the user must approve which content can only be viewed by the user's followers. Critically, Facebook chose to make user profiles public by default for many years. This allowed all users to see and interact with underage users with public profiles by default. Even now, while Facebook claims that it is defaulting certain categories of users into private platforms, it does not limit who may change their setting to public. Once a user changes their settings to public,

16

Facebook again allows all users to message and interact with any user, even if the user is a minor.

73.    Permitting underage users to have public profiles exposes young users to many others on the Facebook platform. Disastrously, many of these potential connections are harmful.

74.    Ultimately, the totality of the Facebook experience, created by the feature and design choices made by Facebook, leads to addictive, compulsive, and excessive use by minors, and Facebook knows that youths are particularly vulnerable to these outcomes, yet refuses to act.

75.    Despite knowing about these outcomes, Facebook chose to continue implementing addictive designs and  features because they drive Facebook's business advancement.

76.    Indeed, these design choices were deliberately made to maximize user engagement. As Sean Parker, Meta's first President, explained in a 2017 interview:

> The thought process that went into building these applications, Facebook being the first of them, to really understand it was all about: "How do we consume as much of your time and conscious attention as possible?" And that means that we need to sort of give you a little dopamine hit every once in a while, because someone liked or commented on a photo or a post or whatever. And that's going to get you to contribute more content, and that's going to get you, you know, more likes and comments. It's a social- validation feedback loop that that it's exactly the kind of thing that a hacker like myself would come up with, because you're exploiting a vulnerability in human psychology. The inventors, creators — it's me, it's Mark [Zuckerberg], it's Kevin Systrom on Instagram, it's all of these people — understood this consciously. And we did it anyway.[25]

77.    "God only knows what it's doing to our children's brains," Mr. Parker also remarked in the same interview.

78.    Similarly, in testimony before Congress in September 2020, Tim Kendall, Facebook's first director of monetization, reaffirmed that Meta had chosen to design its platforms in ways it knew to be dangerous in order to maximize engagement. Mr. Kendall explained:

> We sought to mine as much human attention as possible and turn it into historically unprecedented profits. To do this, we didn't simply create

---

[25] Olivia Solon, *Ex-Facebook president Sean Parker: site made to exploit human 'vulnerability*, The Guardian (Nov. 2017), https://www.theguardian.com/technology/2017/nov/09/facebook-sean-parker-vulnerability-brain-psychology.

17

something useful and fun; we took a page from Big Tobacco's playbook, working to make our offering addictive at the outset....

The next page in Big Tobacco's playbook was to add bronchodilators to cigarettes. This allowed the smoke to get in contact with more surface area of the lungs. Allowing for misinformation, conspiracy theories, and fake news to flourish were Facebook's bronchodilators.

But that incendiary content wasn't enough. Tobacco companies then added ammonia to cigarettes to increase the speed with which nicotine traveled to the brain. Facebook's ability to deliver this incendiary content to the right person, at the right time, in the exact right way—through their algorithms— that is their ammonia. And we now know it fosters tribalism and division.

Social media preys on the most primal parts of your brain, it provokes, it shocks, and it enrages. . . .

Facebook and [its] cohort's worship at the altar of engagement and cast other concerns aside, raising the voices of division, anger, hate, and misinformation to drown out voices of truth, justice, morality, and peace.[26]

79.     Mr. Parker and Mr. Kendall's confessions stand in stark contrast with Meta's public statements about the safety of its platforms made at the time it was expanding the reach of its platform and the design elements meant to prolong interaction. Throughout its changes, re-designs, and launches, Facebook founder and CEO, Mark Zuckerberg, made public statements promising the public that safety was Meta's top priority. For example, in February of 2017, Mr. Zuckerberg posted on his personal Facebook page a statement titled "Building Global Community," in which he talked at length about how Meta is focused on safety, how it intends to use its artificial intelligence to the fullest to keep users safe, and how amazing Facebook is for bringing communities together, promoting critically important social groups, and other statements that were untrue and profoundly dangerous, given what was actually happening at Facebook and what Mr. Zuckerberg knew about the harms his platforms were causing American youth including

---

[26] Testimony of Tim Kendall, House Committee on Energy & Commerce (Sept. 24, 2020), https://nsarchive.gwu.edu/sites/default/files/documents/023.pdf

18

those in Plaintiff's community and schools.

80.    In fact, despite these public facing reassurances of Facebook's safety, in 2017, Meta employees internally reported to management that Facebook was causing harmful dependencies. Despite these known harmful dependencies, Meta was also already marketing to children under 13, despite clear legal mandates that it could not allow children under 13 on its platform. And Meta leadership, including Mr. Zuckerberg himself, actively rejected proposed re-designs intended to minimize the harms to child and teen users, like the youth in Plaintiff's community and schools.

81.    Faced with these undeniably harmful consequences of its design choices, internally, Meta employees have offered countless suggestions and recommendations as to design changes Meta could make to protect its users from the harms Meta causes. Yet, over and over again, Meta leadership has declined, delayed, or outright ignored the vast majority of those in favor of its own financial and growth-related interests.

82.    The reason for Meta's resistance to changing the harmful nature of Facebook's platform is simple: it directly profits from the time, attention, and data provided by its young users, while it encourages young users to post to Facebook.

83.    Tellingly, Meta has conducted studies relating to social comparison harms on its platforms titled: "Social Comparison: Topics, Celebrities, Like Counts, Selfies" and "Appearance-Based Social Comparison on Instagram." These studies have shown that the toxic stew of design features Meta purposely embedded in its platforms cause intense mental harms to young people. Yet Meta continues to systemically implement and use these harmful design features.

84.    While Meta knows that it is harming its young users, leadership has decided to prioritize ever increasing profits over the health and well-being of its minor users.

85.    This fact was detailed by the testimony of Facebook employee France Haugen before Congress. Ms. Haugen testified: "The company's leadership knows ways to make

19

Facebook and Instagram safer and won't make the necessary changes because they have put their immense profits before people."[27]  Haugen continued, "[Facebook's] profit optimizing machine is generating self-harm and self-hate—especially for vulnerable groups, like teenage girls. These problems have been confirmed repeatedly by Facebook's own internal research."[28] As emphasized by Haugen, "Facebook became a $1 trillion company by *paying for its profits with our safety, including the safety of our children*."[29] Haugen's explosive testimony and documentary evidence have unfortunately not changed this conduct.

86.    Because Meta continues to prioritize its own bottom line over mental health, thousands of American children and teens, including those in Plaintiff's schools, continue to use Facebook daily and suffer exposure to its harmful user experience.

### 2.    Meta's Instagram Platform is Purposely Manipulative and Addictive

87.    Instagram is a social media platform that was launched in October 2010 to feature photos taken on mobile devices. Instagram was acquired by Facebook for $1 billion in April 2012.

88.    After Facebook acquired Instagram, it underwent tremendous growth driven by Facebook's implementation of design and developmental changes meant to increase user engagement. These changes to the design and development of Instagram were undertaken without regard to their impact on children and teen users of the social media platform.

89.    Many of the design features implemented on Instagram are the same ones made on Facebook. These include: (1) a "like" button; (2) direct messaging; (3) an algorithm designed to determine what content to show users; and (4) creating content for users to post on its platform. As described above, these features are meant to encourage compulsive and addictive use of the social

---

[27] Frances Haugen, Statement before United States Senate Committee on Commerce, Science and Transportation, Sub-Committee on Consumer Protection, Product Safety, and Data Security (Oct. 4, 2021), https:// www.commerce.sena te.gov/services/files/FC8A558E-824E-4914-BEDB-3A7B1190BD49.
[28] Id.
[29] Id.

media platform leading to negative outcomes for child and teen users.

90. The "like" button feature on Instagram, direct messaging feature, and content creation features on Instagram all work like the same features on Facebook and have the same corresponding harms for adolescent users as described above. Similarly, like Facebook, Instagram permits minors to have public accounts which, for the reasons discussed above, poses known harms to the children and teen users of Instagram.

91. Instagram's push notifications cause the same harms as that of Facebook, while imposing additional harms through its uniquely problematic design. In the case of Instagram, Defendant Meta collects individualized data—not just about the user, but also about the user's friends and contacts—and then crafts notifications, decides notification frequency, and notifies users via text and email using this data. Notifications to individual Instagram users are specifically designed to, and do, prompt them to open Instagram and view what Instagram selected, increasing screentime along with Instagram's bottom line, irrespective of user's health or wellbeing.

92. As recent leaks of internal documents show, Instagram's feed algorithm also poses a unique harm to Instagram's teen users, of which Instagram is well aware. Meta exerts control over a user's Instagram "feed," including through certain ranking mechanisms, escalation loops, and/or promotion of advertising and posts specifically selected and promoted by Meta based on, among other things, its ongoing planning, assessment, and prioritization of the types of information most likely to increase engagement. In the case of certain user groups, like teens, this control translates to Meta's deliberate and repeated promotion of harmful and unhealthy online experiences, which Meta knows is causing harm to minor users.

93. Instagram also has a search feature called "Explore," where a user is shown an endless feed selected by an algorithm designed by Meta based upon the users' demographics and activity in the application. The feed is not based on the user's searches or requests. Instead, Meta

crafts the feed via its algorithms (which Meta in turn programs to increase engagement and in other ways Meta knows to be harmful to users, but more profitable to Meta), as well as paid advertisements created with Meta's assistance or approval, and the like. Indeed, Meta's internal analyses indicate that the "Explore" feature is amongst the most damaging features for teens:



See Teen Girls Body Image and Social Comparison on Instagram—An Exploratory Study in the U.S., supra note 18 at 31.

94.     These leaked reports from Meta also show that it is aware that Instagram is causing serious mental health problems for its teen users and has even categorized the various harms this social media platform inflicts on its teen users.[30]

---

[30] Teen Mental Health Deep Dive, WSJ (Sept. 29, 2021), https://s.wsj.net/public/resources/documents/teen-mental-health-deep-dive.pdf.

# The perfect image, feeling attractive, and having enough money are the most likely to have started on Instagram



# Teens blame Instagram for increases in the rates of anxiety and depression among teens

- This reaction was unprompted and consistent across all groups
- Constant comparison on Instagram is "the reason" why there are higher levels of anxiety and depression in young people
- Social comparison and perfectionism are nothing new, but young people are dealing with this on an unprecedented scale.
- The proliferation of new and different ways to compare themselves to others, combined with constant access to means that there is no way to escape social comparison on IG.
- For both boys and girls, this was called out as being the number one reason why IG is worse than other platforms for mental health. And, young people openly attribute their increased level of anxiety and depression to Instagram.

"The reason why our generation is so stressed us and has higher anxiety and depression than our parents is ... is those we have to deal with social media. Everyone feels like they have to be perfect."
- U.S. Female

# Harm on Instagram falls into three categories



23

*See supra*, "Teen Mental Health Deep Dive," pp. 18, 27, 32 (examples only).

95.    Instagram's platform also has features known as "Reels" and "Stories," which promote the use of short videos and temporary posts. Such features were developed to appeal to teens, and Meta knows those features create a toxic environment that is addictive and harmful:



*See Teen Girls Body Image and Social Comparison on Instagram, supra* note 18, at 33-34.

24

96. Yet, despite knowing the harmful consequences of Instagram's algorithms, Meta refused to implement changes that could protect the mental health of its young users, instead, once again, prioritizing profits over the well-being of its children and teen users. Indeed, during Meta's 2022 Third Quarter Earnings Conference call, Mark Zuckerberg touted that increasing time spent on the Company's platforms is one of the metrics it follows, noting that reels are "'incremental' for users spending time on Instagram" and that "'[t]he trends look good here, and we believe that we're gaining time spent share on competitors like TikTok.'"[31]

97. Meta consciously disregards any duty to protect minors in Plaintiff's school.

B.    **YouTube's Design is Purposefully Manipulative and Addictive**

98. YouTube is the second-most visited website on the internet. Amazingly, 2002 surveys by the Pew Research Center found that 95% of American teenagers used YouTube, and one in five of them reported using YouTube almost constantly.[32]

99. YouTube largely earns revenue through advertisements. To maximize profits, YouTube's design allows it to embed targeted advertising, including the promotion of featured content, directly into the video clips that users watch.[33]

100. Users can create YouTube channels where they create and post content. When a channel reaches a viewership threshold, its owner can sell ads and deliver them to one's viewers. That advertisement revenue is then shared with YouTube. YouTube's systems, policies, and features encourage creators to post more content, to then earn rewards and convert them into cash.

101. YouTube has two types of advertising its channel owners can use. The first is contextual advertising which is informed by the particular channel or video. The second is

---

[31] Kate Duffy, Mark Zuckerberg says Instagram Reels are booming despite celebrities such as Kim Kardashian and Kylie Jenner slamming the app for being like TikTok, Yahoo! Finance (Oct. 27, 2022), https://finance.yahoo.com/news/mark-zuckerberg-says-instagram-reels-121319465.html.

[32] Emily Vogels et al., *supra,* note 14.

[33] Andrew Beattie, *How YouTube Makes Money Off Videos*, Investopedia (Oct. 31, 2021), https://www.investopedia.com/articles/personal-finance/053015/how-youtube-makes-money-videos.asp.

25

behavioral advertising which is informed by the behavior of the device owner as tracked across different websites, apps, and devices. YouTube defaults to behavioral advertising and, while it technically permits channel owners to turn off default behavioral advertising and serve instead contextual advertising that does not track viewers, almost no channel owners make this choice. This is likely because channel owners receive warnings that disabling behavioral advertising can significantly reduce their channel's revenue.

102. YouTube's advertising strategy is effective, as demonstrated by the fact that it generated total advertising revenues of $28.8 billion and $29.2 billion in fiscal years 2021 and 2022 respectively.

103. In order to maximize its advertising profits, YouTube has designed and implemented algorithms meant to create compulsive, addictive use of its platform by minors and pushes users into dangerous "rabbit hole" experiences.

104. While YouTube refused to publicly disclose its algorithms, its VP of Engineering described the algorithm it uses in broad terms as follows:

> To provide such custom curation, our recommendation system doesn't operate off of a 'recipe book' of what to do. It's constantly evolving, learning every day from over 80 billion pieces of information we call signals. That's why providing more transparency isn't as simple as listing a formula for recommendations but involves understanding all the data that feeds into our system. A number of signals build on each other to help inform our system about what you find satisfying: clicks, watch time, survey responses, sharing, likes, and dislikes.[34]

105. Whatever the particulars of YouTube's algorithms, it is well aware that such algorithms on its platform promote and amplify violent and harmful experiences.

106. When employees sent internal memos to YouTube leadership, noting the negative effects its algorithm caused, leadership deterred voicing such concerns and directed employees

---

[34] Cristos Goodrow, *On YouTube's recommendation system*, Inside YouTube (Sept. 15, 2021), https://blog.youtube/inside-youtube/on-youtubes-recommendation-system/.

"Don't rock the boat."[35] According to one YouTube employee:

> The company spent years chasing one business goal above others: 'Engagement,' a measure of the views, time spent and interactions with online videos. Conversations with over twenty people who work at, or recently left, YouTube reveal a corporate leadership unable or unwilling to act on these internal alarms for fear of throttling engagement.

107. In 2012, when YouTube realized that more viewers would equate to more ads, it set a company-wide goal to reach one billion hours of viewing a day and rewrote its recommendation engine to maximize for that goal.[36] To reach this goal, YouTube reordered its company policy to maximize addiction by continuing to program its algorithm to prioritize user *engagement* over *safety*, despite knowing such actions harmed its users—including significant numbers of minors.

108. Moreover, YouTube's algorithm-driven experience is essential to its functionality: "YouTube has described its recommendation system as artificial intelligence that is constantly learning which suggestions will keep users watching. These recommendations, it says, drive 70% of views, but the company does not reveal details of how the system makes its choices."[37]

109. YouTube's algorithm automatically chooses what a user will view next, thus users' experience on the platform is crafted by the algorithm, not user's choices. The algorithm similarly drives minors toward content they would not otherwise see, but for YouTube's design choices.

110. YouTube knows that minor users use its platform, which it deliberately designed to evade parental authority and consent.

111. Millions of minors view YouTube daily. Many of Plaintiff's students are now addicted to it and suffer other severe mental harms directly stemming from YouTube's conduct in designing, formatting , and operating its platform, despite knowing the harm it will cause.

---

[35] Mark Bergen, *YouTube Executives Ignored Warnings, Letting Toxic Videos Run Rampant*, Bloomberg (Apr. 2, 2019, 5:00 am), https://www.bloomberg.com/news/features/2019-04-02/youtube-executives-ignored-warnings-letting-toxic-videos-run-rampant.

[36] *Id.*

[37] Max Fisher & Amanda Taub, *On YouTube's Digital Playground, an Open Gate for Pedophiles*, N.Y. Times (June 3, 2019), https://www.nytimes.com/2019/06/03/world/americas/youtube-pedophiles.html.

27

112. YouTube consciously disregards any duty to protect minors in Plaintiff's community and schools.

## C.    Snapchat's Design Is Purposefully Manipulative and Addictive

113. Founded in 2011, Snapchat quickly became an incredibly popular social media app among U.S. teens with 59% of children between the ages of 13-17 reporting using it.[38]

114. Snapchat started as a photo and short video sharing social media application that allows users to form groups and share posts or "Snaps" that disappear after being viewed by the recipients—and became well known for this self-destructing message feature. Specifically, Snapchat allows users to form groups and share posts, or "Snaps," that disappear after being viewed by the recipients. However, Snapchat quickly evolved from there, as its leadership made design changes and rapidly developed new features that were intended to, and that did increase, Snapchat's popularity among teen users.

115. Among the features added by Snapchat were video capabilities, stories, and chat features. These features evolved and also grew to include various propriety features including "Our Story," Geofilters and Community Geofilters, and Snapcash.

116. Snapchat monetized its user base by allowing advertisers to reach those users. The more viewers and time they spend engaging with the platform, the more profits Snap will realize.

117. Snapchat estimates it has tens of millions of teen users. Disturbingly then, Snap employs numerous algorithmic features that foster the dangerous use of its platform by teenagers.

118. One of these features is "Quick Add" which sends messages to users suggesting they should "friend" another user on Snapchat. These Snap-initiated messages result in exposure to harmful contacts, bullying, and dangerous predators and are designed to reinforce addiction and increase the odds of maintaining more users for longer.

---

[38] Emily Vogels et al., *supra* note 14.

28

119. Snapchat also generates an "Explore" feed that pushes out an infinite stream of videos. Snap designs features to grab users' attention and hold it for as long as possible, and have led many people, from psychologists to government officials, to describe Snapchat as "dangerously addictive."

120. Snapchat also offers several unique messaging and data features. It is perhaps most famous for its self-destructing message design feature, which appeals to minors and makes it more difficult for parents to monitor their children's social media activity. This is an inherently dangerous feature because it both encourages and allows minor uses to exchange harmful, illegal, and sexually explicit images with adults, and provides those same adults with an efficient vehicle to recruit victims. Snapchat is a go-to application for sexual predators because of this feature.

121. For years Snapchat has received reports of child abuse and bullying occurring through its platform and because of its features.[39] Despite these alarming reports, Snapchat continues to use and promote these features so that it does not decrease the popularity of platform.

122. The disappearing photo feature is also dangerous because it does not actually work as advertised. Indeed, while teens rely on Snap's representations when taking and sending photos that they will disappear, recipients are actually able to save photos – and then often use the photos a teen took under the assumption that it would be automatically deleted to bully, exploit, and/or sexually abuse the teen who took the photo.

123. In 2014, Snapchat added "Stories" and "Chat" features that allowed users to post longer stories that could be viewed by users outside the user's friends. On information and belief, during the relevant time period, Snapchat's algorithmically ranking of Stories made sure that Stories from accounts that a user interacted with the most appeared at the top of the user's Stories.

---

[39] Zak Doffman, *Snapchat Has Become A 'Haven for Child Abuse' with its 'Self-Destructing Messages'*, Forbes (May 26, 2019, 5:13 am), https://www.forbes.com/sites/zakdoffman/2019/05/26/snapchats-self-destructing-messages- have-created-a-haven-for-child-abuse/.

124. Snapchat also allows users to enable the sharing of their location, through a tool called Snap Map, which allows the users' followers (and the public for Snaps submitted by the users) to see the user's location on a map. At all times relevant, this feature was available to all users, including minors. This is an inherently dangerous feature, which serves no practical purpose – but that does provide strangers and predators with access to the location of minor victims. This feature has directly contributed to stalking and other, physical harms and assaults perpetrated on minors, and these are harms known to Snapchat.

125. Snap also has a "My Eyes Only" functionality that encourages and enables minor users to hide harmful material from parents by allowing them to hide material in a special tab that requires a passcode, and where material cannot be recovered – even by Snapchat itself – without the correct passcode. The material self-destructs if a user attempts to access the hidden folder with the wrong code. My Eyes Only allows Snapchats' young users to hide potentially harmful material from parents and/or legal owners of the devices used to access Snap.

126. On information and belief, Snapchat's disappearing messages are harmful for this reason as well. Snapchat has possession, custody, or control of that data, and knows that it will be relevant and material in the event of litigation, but has designed its technologies – *i.e.*, its advertised "disappearing" functionality which suggests that Snap itself no longer has access to such data – in a manner that frustrates and actively prevents parents from monitoring the activity of their underage children on Snapchat. These are serious harmful features, which Snapchat should be required to remedy immediately.

127. Like Meta and TikTok, Snapchat also sends push notifications and emails to encourage addictive behavior and to increase use of Snapchat. Snapchat's communications are triggered and based upon information Snapchat collects from and about its users, and Snapchat "pushes" these communications to teen users in excessive numbers and disruptive times of day.

30

These notifications are specifically designed to, and do, prompt them to open Snapchat, increasing sessions, and resulting in greater profits to Snapchat. Even the format of these notifications has been designed to pull users back on to the social media platform—irrespective of a user's health or wellbeing.

128. Snapchat also features a series of rewards including trophies, streaks, and other signals of social recognition similar to the "likes" metrics available across other platforms. These features are designed to encourage users to share their videos and posts with the public. Moreover, they are designed to be addictive, and to encourage greater use of Snapchat without regard to any other content or third-party communication. While the names of these various metrics have changed over time, and certain metrics have been phased out and others phased in, their core collective function—rewarding harmful over engagement with Snapchat—has never changed.

129. These features serve no purpose other than creating dependencies on Snapchat by children and teens, which dependencies in turn cause sleep deprivation, anxiety, depression, anger, shame, interpersonal conflicts, and other serious harms to mental and physical health.

130. Snapchat incorporates several other features that serve no functionality purpose, but that do make Snapchat more appealing to children and teens (*i.e.*, avatars, emojis, and games) while simultaneously using known mechanisms to addict those same children and teens (*i.e.*, streaks and trophies offering unknown rewards). These features and the ones discussed above were particularly addictive to youths and were targeted to underage users.

131. The Snap Streak feature is unique to Snapchat and is one of the most – if not *the* most – addictive feature available especially to teenagers. Snap Streaks provide a measure of a user's interaction with another user, in the form of a symbol representing the user's consistent engagement with the other user's posts after a certain amount of time. If the user fails to engage with future messages from that user fast enough, Snap removes this symbol from both users'

profiles. Because of Snapchat's successful efforts to integrate itself into the lives of American children, this creates social pressure to engage with Snapchat—or risk the humiliation of losing Snap Streaks. Snapchat has known for years that Snap Streak is addictive and generates compulsive use of the app in minors, yet it continues to provide and promote that feature to teens and children.

132. Snapchat has also developed images for users to decorate the pictures or videos they post, and Snapchat has developed Lenses, which are augmented reality-based special effects and sounds for users to apply to pictures and videos users post on Snapchat, and World Lenses to augment the environment around posts. Snapchat also has acquired publication rights to music, audio, and video content that its minor users can incorporate in the pictures and videos they post on Snapchat.

133. These images, Lenses, and licensed audio and video content supplied and created by Snapchat frequently make a material contribution to the creation or development of the minor user's Snapchat posts. Indeed, in many cases, the *only* content in a user's Snapchat post are images, Lenses, and licensed audio and video content.

134. Snap consciously disregards any duty to protect minors in Plaintiff's community and schools.

D.    **TikTok's Design is Purposefully Manipulative and Addictive**

135. TikTok was launched in or around 2017 for iOS and Android in most markets outside of mainland China and became available worldwide after merging with another Chinese social media service, Musical.ly, on August 2, 2018.

136. TikTok is a video sharing social media application where users create, share, and view short video clips. TikTok hosts a variety of short-form user videos, from genres like pranks, stunts, tricks, jokes, dance, and entertainment with durations from fifteen seconds to ten minutes.

137. Users on TikTok who open the TikTok application are automatically shown an endless stream of videos selected by an algorithm developed by TikTok to shape the user experience on the "For You" page based upon the user's demographics, likes, and prior activity on the app.

138. TikTok, just like the other Defendants, has designed its algorithms to addict users and cause them to spend as much time on the application as possible, including through advanced analytics that create a variable reward system tailored to user's viewing habits and interests.

139. A leaked internal TikTok document titled "TikTok Algo 101"[40] was created by TikTok's engineering team in Beijing and offers details about both the app's mathematical core and insight into the company's understanding of human nature. The document explains that in the pursuit of the company's "ultimate goal" of adding daily active users, it has chosen to optimize for two closely related metrics in the stream of videos it serves: "retention"— that is, whether a user comes back— and "time spent." The document offers a rough equation for how videos are scored, in which a prediction driven by machine learning and actual user behavior are summed up for each of three bits of data: likes, comments and playtime, as well as an indication that the video has been played.

140. Moreover, an expose by the New York Times noted how TikTok markets itself as an "artificial intelligence company." "The most obvious clue is right there when you open the app: the first thing you see isn't a feed of your friends, but a page called 'For You.' It's an algorithmic feed based on videos you've interacted with, or even just watched. It never runs out of material. It is not, unless you train it to be, full of people you know, or things you've explicitly told it you want to see. It's full of things that you seem to have demonstrated you want to watch, no matter what you actually say you want to watch. Imagine a version of Facebook that was able to fill your

___

[40] Ben Smith, *How TikTok Reads Your Mind*, N.Y. Times (Dec. 5, 2021), https://www.nytimes.com/2021/12/05/business/media/tiktok-algorithm.html.

33

feed before you'd friended a single person. That's TikTok."[41] Another New York Times article confirms, "The FYP algorithm is TikTok's secret sauce, and a big part of what makes it so accurate is ByteDance's global reach. Every swipe, tap and video viewed by TikTok users around the world—billions and billions of data points a day—is fed into giant databases, which are then used to train artificial intelligence to predict which videos will keep users' attention."[42]

141. TikTok also features and promotes various "challenges" where users film themselves engaging in behavior that mimics and "one ups" other users posting videos related to a particular challenge. TikTok promotes users creating and posting videos of challenges identified by a system of hashtags that are promoted within TikTok's search feature.

142. TikTok's app and algorithm have created an environment in which TikTok "challenges" are widely promoted and result in maximum user engagement and participation, thus financially benefiting TikTok. At the same time, TikTok "challenges" involve users filming themselves engaging in behavior that is routinely dangerous or risky.

143. TikTok's algorithm presents these often-dangerous "challenges" to users on their FYP and encourages users to create, share, and participate in the "challenge."

144. These are just some examples of how TikTok operates to generate profit, at the expense of the health and well-being of its users, particularly its child and teen users.

145. Until mid-2021, TikTok also and by default made all users profiles "public," meaning that strangers, often adults, could view and message underage users of the TikTok app. This also meant that those strangers could then contact children directly.

146. Like Meta and Snapchat, TikTok also sends push notifications and emails to encourage addictive behavior in minors and to increase minor use of TikTok. TikTok's

---

[41] John Herrman, *How TikTok is Rewriting the     World*, N.Y. Times (Mar. 10, 2019), https://www.nytimes.com/2019/03/ 10/style/what-is-tik-tok.html.
[42] Kevin Roose, *Is TikTok a Good Buy? It Depends on What's Included*, N.Y. Times (Aug. 5, 2020), https ://www.nytimes.com/2020/08/05/technology/tiktok-deal-algorithm.html.

communications are triggered and based upon information TikTok collects from and about its users, and TikTok "pushes" these communications to teen users in excessive numbers and at disruptive times of day. These notifications are specifically designed to, and do, prompt them to open TikTok, increasing sessions, and resulting in greater profits to TikTok. Even the format of these notifications has been designed to pull users back on to the social media platform— irrespective of a user's health or wellbeing.

147. Despite this, TikTok markets itself as a family-friendly social media application, and markets to children and teens.

148. TikTok exclusively controls and operates the TikTok platform for profit, which like Instagram and Snapchat, creates advertising revenue through maximizing the amount of time users spend on their platforms. Accordingly, while TikTok purports to have a minimum age requirement of 13-years-old, it does little to verify user age or enforce its age limitations despite knowledge that underage use is widespread.

149. TikTok does not seek parental consent for underage users or provide warnings or adequate controls that would allow parents to monitor and limit the use of TikTok by their children. TikTok does not verify user age, enabling and encouraging teens and children to open TikTok accounts, providing any age they want, without parental knowledge or consent.

150. Further, based on TikTok data leaked to the New York Times, internal TikTok documents show that the number of daily U.S. users in July of 2020 estimated by TikTok to be 14 or younger—a whopping 18 million—was almost as large as the number of over-14 users, which is around 20 million. The rest of TikTok's U.S. users were classified as being "of unknown age."[43]

151. On information and belief, a substantial percentage of TikTok's U.S. users are age 13 or younger.

---

[43] Raymond Zhong, Sheera Frankel, *A Third of TikTok's U.S. Users May Be 14 or Under, Raising Safety Questions*, N.Y. Times (Aug 14, 2020), https://www.nytimes.com/2020/08/14/technology/tiktok-underage-users-ftc.html.

152. Like the other Defendants, TikTok seeks to boost and prolong its minor users' engagement, hooking them to its platform by any means necessary. TikTok also develops memes and other images for users to apply to images and videos they post on TikTok. TikTok also acquired publication rights to music that its users can incorporate in the pictures and videos they post on TikTok. TikTok knows that harms young users, yet it consistently prioritizes profit over the health and well-being of its young users—who numbering in the tens of millions—continue to use TikTok's inherently dangerous and harmful social media platform, every single day.

153. Evidenced by ByteDance's Chinese version of TikTok (Douyin), protections are available.[44] But TikTok consciously disregards any duty to protect Plaintiff's students.

## V.    DEFENDANTS' PLATFORMS ARE DESIGNED TO MAXIMIZE YOUNG USERS' SCREEN TIME AND TRIGGER ADDICTION

154. The sole object sought by each Defendant is identical: Almighty Adverting dollars. The Defendants also share the precise method of achieving ever higher revenues: to fuel addition by maximizing user screen time, including usage by minors. Defendants receive revenue from advertisers who pay a premium to target advertisements to exploit specific user behavior and demographic groups, including minors—one of the most profitable target demographics. The information Defendants gather about each one of their users, coupled with having the undivided attention of those habitual users, is an extremely valuable commodity for advertisers.

155. While Defendants advertise their platforms as "free" because they do not charge their users, they generate massive revenues by finding unique and increasingly dangerous ways to capture users' attention and tailor advertisements to each minor user. In fact, Defendants' revenue is directly linked to the level of user engagement and the amount of time users spend on their platforms, which directly correlates with the number of advertisements that can be shown to each

---

[44] *China: Children given daily time limit on Douyin – its version of TikTok*, BBC (Sept. 20, 2021), https ://www.bbc.com/news/technology-58625934.

minor user. For example, Defendants use changing rewards that are designed to prompt minor users to engage with their social media platforms in excessive and dangerous ways.

156. Defendants know, or in the exercise of ordinary care should know, that their designs have created extreme and addictive usage by their minor users, and Defendants knowingly or purposefully designed their platforms to encourage such addictive behaviors. For example, all the achievements and trophies in Snapchat are unknown to users until they are unlocked. The Company has stated that "[y]ou don't even know about the achievement until you unlock it." This design is akin to a slot machine but marketed toward minor users who are even more susceptible than gambling addicts to the variable reward and reminder system designed by Snapchat. The system is designed to reward increasingly extreme behavior and usage by minors.

157. Similarly, Facebook and Instagram, like Snapchat and TikTok, are designed around a series of features that seek to exploit minor users' susceptibility to persuasive design and unlimited accumulation of unpredictable and uncertain rewards, including "likes" and "followers." This design is unreasonably dangerous to the mental well-being of minors' developing minds and has resulted in mental health disorders in youths in school districts, just like that of the Plaintiff.

158. Defendants report employing thousands of psychologists and engineers to help make their platforms maximally addictive. For example, Instagram's "pull-to-refresh" is based on how slot machines operate. It creates an endless feed experience, designed to manipulate brain chemistry and prevent natural end points that would otherwise encourage minor users to move on to other activities.[45]  Rather than warning users or parents of the addictive design of their social media platforms, Defendants actively conceal the dangerous and addictive nature of their platforms, lulling minor users and parents into a false sense of security. This includes consistently

---

[45] Daniel Kruger, Ph.D., M.S., *Social Media Copies Gambling Method 'to create psychological cravings'*, University of Michigan Institute for Healthcare Policy & Innovation (May 8, 2018), https://ihpi.umich.edu/news/social-media- copies-gambling-methods-create-psychological-cravings.

playing down their platforms' negative effects on children in public statements and advertising, making false or materially misleading statements concerning safety, and refusing to make their research public or available to academics and lawmakers who request it.

159. Defendants repeatedly represented to the public and the government that their platforms are safe and not addictive.

160. For example, YouTube represents that it enforces its "Community Guidelines using a combination of human reviewers and machine learning," and that its policies "aim to make YouTube a safer community …." TikTok represents in its community guidelines that its priority is "safety, diversity, inclusion, and authenticity," and Snap's Terms of Service claim, "We try hard to keep our Services a safe place for all users."

161. Defendants know their platforms are addictive, as they designed them to be, and they know millions of minor users are addicted and/or engaging in excessive and risky use, triggering mental health issues. Defendants also know, or in the exercise of reasonable care should know, that their social media platforms are unreasonably dangerous to the mental well-being of minor users' developing minds.

162. Yet Defendants continue to engineer their platforms to keep users, and particularly minors, engaged longer and more frequently. This "engineered addiction" includes features like bottomless scrolling, tagging, notifications, and live stories.

163. Defendants also exploit minor users' susceptibility to persuasive design and unlimited accumulation of unpredictable and uncertain rewards (like "likes," "followers," "views, "streaks," and "trophies"). As recently detailed by the FTC, these design features are manipulative, dark patterns that deceive minor users into staying on the application and steer

excessive usage of social media platforms.[46]

164. Defendants purposefully engineer addiction by minors to exploit this advertising demographic and reap significant profits in advertising revenue.

## VI.  DEFENDANTS PURPOSELY EMPLOY DESIGNS THAT ADDICT MINORS TO THEIR PLATFORMS

165. Defendants intentionally designed their platforms to maximize minors' screen time, using complex algorithms and other features designed to exploit human psychology and driven by the most advanced computer algorithms and artificial intelligence available.

166. In particular, Defendants willfully, recklessly, and intentionally designed their social media platforms to exploit minors in order to extend and expand their users' engagement with their products. Defendants target youth to exploit the still-developing brains of children through the use of artificial intelligence, machine learning, and complicated algorithms to promote extreme utilization. Defendants calibrate and optimize these addiction methods on a continual basis with one goal: to maximize revenues.

167. Defendants designed and progressively modified their platforms to promote problematic and excessive use , which they know is indicative of addictive and self-destructive use by minors. For instance, Defendants use information "feeds" that deliver personalized content, including photos, videos, and other promoted subject matter to promote maximum engagement by their minor users on an endless cycle. YouTube, Facebook, Instagram, and TikTok all use complex algorithms to optimize user interaction through these never-ending "feeds." The endless cycle has been described by psychologists as a "flow state" that distorts a user's ability to perceive

---

[46] FTC Staff Report, *Bringing Dark Patterns to Light*, FTC Bureau of Consumer Protection (Sept. 2022), https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%209.14.2022%20%20FINAL.pdf.

time.[47] Former Google design ethicist Tristan Harris has described this endless cycle as being intentionally designed to eliminate any reason to pause or discontinue using the platform by replacing the traditional close-ended experience of consuming media with an infinite one.[48]

168. Defendants know that algorithm-controlled feeds promote unlimited "scrolling," a type of use that studies have identified as detrimental to users' mental health. Defendants promote this use because it allows for more advertisements and revenue from each minor user.

169. Meta, YouTube, and TikTok's algorithm-controlled features are designed to ensure experiences most likely to increase user engagement, which often means experiences that Defendants know to be harmful to their minor users. This includes experiences that minors would otherwise never have but for Defendants' sorting, prioritizing, and/or affirmative pushing of such experiences to minors' accounts. In the words of one, high-level departing Meta employee,

In September 2006, Facebook launched News Feed. In October 2009, Facebook switched from chronological sorting to an algorithmic ranking. 10 years later, in July 2019, Sen. Josh Hawley introduced a bill to the US Senate that would ban features in app feeds, such as infinite scroll.

The response in 2006 was largely positive; the response in 2009 was negative from a vocal minority, but still largely positive; the response in 2019 was largely "lol, wut?" If I had to guess, the response to government regulation around engagement centric information feeds in 2026 will be "Omg finally".

"Why We Build Feeds" (Oct. 4, 2019).[49]

170. The addictive nature of the Defendants' platforms and the psychologically manipulative functionality of their algorithms are unknown to consumers, particularly minors.

171. Instead of disclosing the addictive and harmful nature of their social media platforms, Defendants instead act to prevent transparency by making public statements about the

---

[47] Gino Gugushvili et al., Facebook use intensity and depressive symptoms: a moderated mediation model of problematic Facebook use, age, neuroticism, and extraversion at 3, BMC Psych. 10, 279 (2022), https://doi.org /10.1186/s40359-022-00990-7.
[48] Von Tristan Harris, *The Slot Machine in Your Pocket*, Spiegel International (July 27, 2016), https://www.spiegel.de/in ternational/zeitgeist/smartphone-addiction-is-part-of-the- design-a- 1104237.html.
[49] *Available at* https://www.documentcloud.org/documents/21600853-tier1_rank_exp_1019

safety of their platforms, knowing they are untrue and describing their platforms as "free"

172. Meta, YouTube, and TikTok's algorithms adapt to promote whatever user experiences will trigger minor users' engagement and maximize their screen time. Once a minor user engages with abusive, harmful, or destructive experiences, Defendants' algorithms will direct the minor user to experiences that are progressively more abusive, harmful, and destructive to maximize the user's screen time.

173. For example, Defendants manipulate human psychology using the same techniques deployed by casinos and slot machines, including by the use of intermittent variable rewards ("IVR"), which work by tapping into the human reward pathway that regulates dopamine production. Through IVR, Defendants space out dopamine-triggering stimuli vis-à-vis staggering user rewards on their platforms. IVR causes users to engage with the platform again and again, not disengaging because there is an anticipatory "hit" of dopamine right around the corner. As a result, minor users anticipate the next "hit" of dopamine, creating the same craving effect experienced by gambling addicts.

174. Defendants, such as Instagram intentionally delay the loading time of content with each scroll or refresh to mimic the same anticipatory dopamine reward that casinos use. Defendants also knowingly manipulate the reward pathways of users by giving a carefully engineered moment to build anticipation, just like the spinning of the reels or the shuffling of the cards in a casino. Whenever user content receives a "like" or a "heart," Defendants' platforms provide a reward to minors for their use, leading to additional use and addiction.

175. Defendants deliberately and intentionally employ these schemes to encourage use by teens and children, who are especially vulnerable due to their developing brains. Young brains are especially susceptible to Defendants' strategies and manipulation. Between the ages of 10 and 12, children undergo fundamental changes in their neurological reward pathways that promote extra

41

dopamine and oxytocin rewards for socially advantageous behavior such as admiration, attention, and approval from others.[50] Unlike adults with a more developed prefrontal cortex to regulate emotions and who have a more developed sense of self, developing adolescents have a limited capacity to resist emotional and social pressures and regulate impulses. As a result, they seek admiration, attention, and approval from others with much more persistence than adults.

176. Defendants have knowingly, deliberately, and intentionally designed and managed their social media platforms in a way that endangers minors. Although Defendants know that their social media platforms harm minors, they continue to develop increasingly sophisticated technologies and methods to ensure minors are engaged with their platforms more intensively and for longer periods.

177. Defendants' efforts have been successful, as minors increasingly spend time on social media platforms. Not only are adolescents particularly vulnerable to Defendants' psychological manipulations and resulting addiction, but they are also at much greater risk of developing mental disorders as a result of their social media usage driven by Defendants.

## VII.    DEFENDANTS' PLATFORMS HARM THEIR MINOR USERS

### A.    Defendants Promote and Cause Increased Usage of Their Platforms by Minors

178. The addiction and compulsion to use social media, created by Defendants, have negative mental health consequences on minors. Defendants have driven this compulsion and have contributed to the increased mental health disorders experienced by minors, including anxiety, depression, eating disorders, and suicide.

179. Defendants caused the current youth mental health crisis long before the pandemic. But the pandemic led students to spent more and more time online, which increased their exposure

---

[50] Zara Abrams, *Why young brains are especially vulnerable to social media*, Am. Psych. Ass'n (Aug. 25, 2022), https://www.apa.org/news/apa/2022/social-media-children-teens.

to Defendants' platforms and manipulations. During remote learning and as students returned to school, there was an increased incidence of students paying attention to Defendants' social media products while in class in lieu of being mentally present in the classroom.

180. Pre-pandemic, American adolescents increasingly used social media for large portions of their day. Usage rose by 3% yearly for tweens and 11% for teens.[51] Following 2019, social media usage increased at a pace of 17% annually, with an average of 8 hours and 39 minutes of daily usage by teens in 2021.[52] Global studies confirm drastic increases in screen time as social interactions shifted online.[53]

181. A comparative Pew Research confirms the steep rise in time teens spent online :[54]



**Nearly half of teens now say they use the internet 'almost constantly'**

*% of U.S. teens who say they use the internet ...*

Note: Teens refer to those ages 13 to 17. Figures may not add up to the NET values due to rounding. Those who did not give an answer are not shown.
Source: Survey conducted April 14-May 4, 2022.
"Teens, Social Media and Technology 2022"

**PEW RESEARCH CENTER**

---

[51] *The Common Sense Census: Media Use by Tweens and Teens*, Common Sense (2021), https://www.commonsense med ia.org/sites/default/files/research/report/8-18-census-integrated-report-final-web_0.pdf.
[52] *Id.*
[53] A review of 46 research studies globally found that on average screen time for children and adolescents increased by 52% (84 minutes per day) during the pandemic. *See* Sheri Madigan et al., *Assessment of Changes in Child and Adolescent Screen Time During the Covid-19 Pandemic*, JAMA Pediatrics (Nov. 7, 2022), https://jamanetwork.com/journals/jamapediatrics/fullarticle/2798256.
[54] Emily Vogels et al., *supra* note 14.

182. As part of that extreme growth in overall social media usage, social media dependence increased, with 54% of teens saying it would be hard to give up social media.[55]

183. Confirming this explosion of social media usage by youths, a significant proportion of teens report using Defendants' social media platforms almost constantly.



**About one-in-five teens visit or use YouTube 'almost constantly'**

*% of U.S. teens who say they ...*

Ever use this app or site — 95 (YouTube); Almost constantly visit or use this app or site — 19 (YouTube)

YouTube 67 / 16 (TikTok), 62 / 10 (Instagram), 59 / 15 (Snapchat), 32 / 2 (Facebook)

YouTube    TikTok    Instagram    Snapchat    Facebook

Note: Teens refer to those ages 13 to 17. Those who did not give an answer or gave other responses are not shown.
Source: Survey conducted April 14-May 4, 2022.
"Teens, Social Media and Technology 2022"

PEW RESEARCH CENTER

184. The specific mix of platform use is based on current trends, with TikTok not even registering in 2018 surveys, but being the second-highest used platform in 2022.

**YouTube, Instagram and Snapchat are the most popular online platforms among teens**

*% of U.S. teens who ...*

| | Say they use ... | Say they use ___ most often |
|---|---|---|
| YouTube | | |
| Instagram | | |
| Snapchat | | |
| Facebook | | 10 |
| Twitter | | 3 |
| Tumblr | | <1 |
| Reddit | 7 | 1 |
| None of the above | 3 | 3 |

Note: Figures in first column add to more than 100%, because multiple responses were allowed. Question about most-used site was asked only of respondents who use multiple sites; results have been recalculated to include those who use only one site. Respondents who did not give an answer are not shown.
Source: Survey conducted March 7-April 10, 2018.
"Teens, Social Media & Technology 2018"

PEW RESEARCH CENTER

---

[55] Id.

185. Notably, increased usage led teens to report a *decreasing* enjoyment of social media,[56] which is characteristic of an addictive response.

### B.    Minors' Brains are Particularly Susceptible to Manipulation by Defendants

186. In February 2023, during the Senate Judiciary Committee's hearing on social media's impact on child, teen, and adolescents' mental health, Senator Richard Blumenthal stated that America is in the midst of "a public health emergency egregiously and knowingly exacerbated by Big Tech. Aggravated by toxic content on eating disorders, bullying, even suicide. Driven by Big Tech's black box algorithms, leading children down dark rabbit holes."[57]

187. During adolescence, the brain is still developing and is associated with psychosocial immaturity. Numerous studies have concluded that excessive use of social media can have a detrimental effect on the mental well-being of youth and teens. Social media use, especially compulsive or excessive use, can result in various psychological disorders, including behavioral, developmental, emotional, and mental disorders, such as anxiety, depression, thoughts of suicide, and eating disorders.

188. This is exacerbated in teens because their brains are not yet fully developed in regions related to risk evaluation, emotional regulation, and impulse control. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature. The frontal lobes—and, in particular, the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive decision-making. These regions of the brain are central to the process of planning and decision-making, such as evaluating future consequences

---

[56] *See* Victoria Rideout et al., *2021 The Common Sense Census: Media Use by Tween and Teens* at Table D, Common Sense (Mar. 9, 2022), https://www.commonsensemedia.org/research/the-common-sense-census-media-use-by- tweens-and-teens-2021.

[57] Press Release, Blumenthal Calls on Congress to Pass Kids Online Safety Legislation During Senate Judiciary Committee Hearing, Sen. Richard Blumenthal, (Feb. 14, 2023), https://www.blumenthal.senate.gov/newsroom/press/release/blumenthal-calls-on-congress-to-pass-kids-online-safety-legislation-during-senate-judiciary-committee- hearing.

and weighing risks and rewards. Those brain regions are also essential to the ability to control emotions and inhibit impulses. During childhood and adolescence, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin. The brain also undergoes "pruning"—the paring off of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood.

189. For minors, important aspects of brain maturation remain incomplete, including those associated with executive functions and emotion and cognition. These parts of the brain that are critical for control of impulses, emotions, and mature decision-making are still developing in teens. Defendants' social media platforms are designed to exploit minors' diminished decision-making capacity, impulse control, emotional immaturity, and lack of psychological resiliency. Studies have found that immature brains may not possess sufficient self-control to deal with the overwhelming aspects of social media and may lead minors to engage in addictive usage patterns, which Defendants encourage.[58]

190. Defendants know, or in the exercise of reasonable care should know, that because their minor users' frontal lobes are not fully developed, those users experience enhanced dopamine responses to stimuli on Defendants' social media platforms and are much more likely to become addicted to Defendants' platforms. Minors also exercise poor judgment in their social media activity and act impulsively in response to negative social media encounters.

---

[58] Nino Gugushvili et al., *Facebook use intensity and depressive symptoms: a moderated mediation model of problematic Facebook use, age, neuroticism, and extraversion* at 3, BMC Psych. 10, 279 (Nov. 28, 2022), https://doi.org/10.1186/s40359-022-00990-7.

191. Defendants also know, or in the exercise of reasonable care should know, that minor users of their social media platforms are much more likely to sustain serious physical and psychological harm through their social media use than adult users. Nevertheless, Defendants knowingly designed their social media platforms to be addictive to minors and failed to include in their platform designs any safeguards to account for and ameliorate the psychosocial immaturity of their minor users.

192. A 2018 study on the effect of screen time associated with the use of electronic devices showed that staring at electronic screens is unhealthy for teens.[59] First, the study concluded that: (i) "After 1 h[our]/day of use, more hours of daily screen time were associated with lower psychological well-being, including less curiosity, lower self-control, more distractibility, more difficulty making friends, less emotional stability, being more difficult to care for, and inability to finish tasks[;]" (ii) Among teens aged 14 to 17, high users of screens (7+ hours/day) were more than twice as likely [as low users of screens (1 hour/day)] to ever have been diagnosed with depression or anxiety, ever have been treated by a mental health professional, or taken medication for a psychological or behavioral issue in the last 12 months[;] and (3) "[M]ore hours of daily screen time were associated with lower psychological well-being, including less curiosity, lower self-control, more distractibility, more difficulty making friends, less emotional stability, being more difficult to care for, and inability to finish tasks."[60]

193. A 2021 U.S. Surgeon General advisory report stated that mental, emotional, developmental, and/or behavioral disorders are common among American children, with one in five children between the ages of 3-17 suffering from one or more of these disorders.[61] Further,

---

[59] Jean M. Twenge & W. Keith Campbell, *Associations between screen time and lower psychological well-being among children and adolescents: Evidence from a population-based study*, 12 Preventive Med. Rep. 271-83 (Oct. 18, 2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6214874/.
[60] Id:
[61] *U.S. Surgeon General Issues Advisory on Youth Mental Health Crisis Further Exposed by COVID-19 Pandemic* U.S.

"[f]rom 2009 to 2019, the share of high school students who reported persistent feelings of sadness or hopelessness increased by 40%[,]" the share "seriously considering attempting suicide" increased by 36%, and the share creating a suicide plan increased by 44%.[62]

194. Cyberbullying and abusive behavior are also prevalent on Defendants' social media platforms. A Pew Research study from 2018 determined that one in six teenagers has experienced at least one of the following forms of abusive behavior online: (1) name-calling (42%); (2) spreading false rumors (32%); (3) receiving unsolicited explicit images (25%); (4) having their activities and whereabouts tracked by someone other than a parent (21%); (5) someone making physical threats (16%); and (6) having explicit images of them shared without their consent (7%). The survey found that 90% of teens believe online harassment is a problem for people their age, and 63% identify it as a "major problem."[63]

195. Usage of Defendants' social media platforms can also lead to disordered eating and sleep disturbances. A 2019 NIH study found a correlation between a greater number of social media accounts, as well as a greater amount of daily time spent on social media, specifically Snapchat and Instagram, and a higher incidence of eating disorders among young girls.[64] Another study of young adults found "consistent, substantial, and progressive associations between SM [social media] use and sleep disturbance," which "has important clinical implications for the health and well-being of young adults."[65]

196. In fact, numerous studies show that adolescents are susceptible to mental health

---

Dep't of Health & Human Services (Dec. 7, 2021), https://public3.pagefreezer.com/browse/HHS.gov/30-12-2021T15:27/https://www.hhs.gov/about/news/2021/12/07/us-surgeon-general-issues-advisory-on-youth-mental-health-crisis-further-exposed-by-covid-19-pandemic.html.

[62] Id.

[63] Monica Anderson, *A Majority of Teens Have Experience Some Form of Cyberbullying*, Pew Research Center (Sept. 27, 2018),https://www.pewresearch.org/internet/2018/09/27/a-majority-of-teens-have-experienced-some-form-of-cyberbullying/.

[64] Simon M. Wilksch et al., *The relationship between social media use and disordered eating in young adolescents*, 53 Int'l J. Eating Disorders at 96-106 (Jan. 2020), https://pubmed.ncbi.nlm.nih.gov/31797420/.

[65] Jessica C. Levenson et al., *The Association between Social Media Use and Sleep Disturbance Among Young Adults*, 85 Preventive Med. 36-41 (Apr. 2016), https://www.sciencedirect.com/science/article/abs/pii/S0091743516000025.

problems and psychological disorders linked to social media usage, including depression and suicide.[66]

197. There is also "evidence that technology-based social comparison and feedback-seeking behaviors may be associated with depressive symptoms among adolescents."[67]

198. This youth mental health crisis has been caused by Defendants' willful, reckless, intentional, and/or negligent conduct. Defendants designed and marketed their social media platforms to addict youth so that they could profit. Defendants did this because they knew youth are a particularly profitable target audience, and thus much of Defendants' advertising efforts and revenues are focused on and derived from minors.

C.    **Defendants' Conduct Harmed and Continues to Harm Old Forge School District**

199. Promoting social media usage by obscurely deploying an array of psychological stimuli targeting minors, the Defendants' actions led to a mental health crisis that placed severe burdens and financial strains on school districts, including that of the Plaintiff.

200. As social media usage increases mental health disorders in young users, local school districts like the Plaintiff employ youth mental health services and other measures, as first responders to the ongoing youth mental health crises. Moreover, as one of the primary providers of student mental health services, the Plaintiff, along with other local school districts, have been inundated by the increase in youth mental health issues directly associated with increased social media use.

201. Old Forge School District expended additional financial resources in an attempt to

---

[66] *See, e.g.*, Jean M. Twenge et al., Increases in Depressive Symptoms, Suicide-Related Outcomes, and Suicide Rates Among U.S. Adolescents After 2010 and Links to Increased New Media Screen Time, 6 Clinical Psych. Sci. 3-17 (Nov. 14, 2017), https://doi.org/10.1177/2167702617723376.

[67] Jacqueline Nesi & Mitchell J. Prinstein, *Using Social Media for Social Comparison and Feedback-Seeking: Gender and Popularity Moderate Associations with Depressive Symptoms*, 43 J. Abnormal Child Psych. 1427-38 (Nov. 2015), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5985443/.

ameliorate its students' increasing mental health and behavioral disorders. However, Plaintiff will continue to lack sufficient resources to address those disorders, as Plaintiff's available resources are galactically outmatched by that of the Defendants and lightyears behind their exponentially advancing technology that perpetuates those disorders.

202. For examples, Plaintiff recently had to hire an additional school counselor at a cost of $83,300 per year, and also spends another $68,200 annually to employ an additional social worker and provide mental health screenings for its students.

203. Plaintiff desperately needs more social workers, counselors, and the like, but such are beyond its financial capabilities, along with other school districts struggling for more financial and human resources to combat the youth mental health crisis perpetuated by the Defendants.

According to data from the American Academy of Child and Adolescent Psychiatry, most counties in the United States have a severe shortage of **Child and Adolescent Psychiatrists (CAPs)** per 100,000 children.

Red=low number of Child and Adolescent Psychiatrists (CAPs)

< 5   5–10   10–15   15–20   20–25   25–30   30–35   35–40   40–45   ≥ 45



Map: Dilcia Mercedes, CBS News · Source: American Academy of Child and Adolescent Psychiatry

204. Given the shortage compared to the extent of the youth mental health crisis, the number of teens and adolescents waiting in emergency rooms for mental health treatment for suicide nationwide has tripled from 2019 to 2021.[68]

205. Like the Plaintiff, local school districts have borne increased costs and expenses in response to the youth mental health crisis fueled by Defendants. Some examples are:

- Hiring additional mental health staff (41% of public schools added staff to focus on student mental health);[69]
- Developing additional mental health resources (46% of public schools created or expanded mental health programs for students, 27% added student classes on social, emotional, and mental health);[70]
- Training teachers to help students with mental health (56% of public schools);[71]
- Increasing disciplinary measures in response to increased bullying and harassment via social media;
- Repairing property damage from students acting out as the result of mental health incident;
- Diverting time and resources from educational instruction to notify parents and guardians of students' behavioral issues and attendance;
- Investigating and responding to threats against students or staff initiated via social media; and/or
- Updating student handbooks and policies to address use of Defendants' platforms.

206. Like practically every other school across the country, the Plaintiff has been directly harmed by the mental health crisis because, in the interest of its students, their families, and the community, it must dedicate critical yet extremely limited financial and human resources to address that quickening crisis caused by the Defendants.

207. Plaintiff's need for additional resources to address the mental health of its students was directly caused by the mental health crisis created by the Defendants. Plaintiff's students confront mental health issues now more than ever, due to their excessive, addictive social media

---

[68] Stephen Stock et al., *Children languish in emergency rooms awaiting mental health care*, CBS News (Feb. 27, 2023, 8:02 am), https://www.cbsnews.com/news/emergency-rooms-children-mental-health/.
[69] Nirmita Panchal et al., *The Lanscape of School-Based Mental Health Services*, Kaiser Family Foundation (Sept. 6, 2022), https://www.kff.org/other/issue-brief/the-landscape-of-school-based-mental-health-services/.
[70] Id.
[71] Id.

usage—which was purposely cultivated by the Defendants' coded designs.

208. To address the decline in minors' mental, emotional, and social health, resulting misconduct, and protect its student body, Plaintiff has been forced to expend resources that would otherwise be used to deliver education and other student services.

209. During the 2023-2024 school year alone, local police were emergency summoned to just the Plaintiff's high school alone on sixty (60) separate occasions to deal with one particular form of misdirected student reaction or another, be it a physical threat to persons or property on school grounds, some reaction to the frequent cyberbullying that occurs via social media, or worse, actual physical violence, destruction of property, or both!

210. Thus the Plaintiff is continually overtaxed by the countless, negative trickle-down effects of such disruptions, of which the Defendant's actions are the direct proximate cause or a substantial factor in causing those innumerable, daily burdens placed on the Plaintiff.

211. Without judicial intervention, the Plaintiff and its counterparts all across the country will remain financially strapped and unable to address the student mental health crisis, created by Defendant Social Media Companies' addictive designs and algorithms—which they unleashed upon America's youth just to feed their insatiable appetite for corporate profits.

## VIII.  THE COMMUNICATIONS DECENCY ACT ALLOWS COMPUTER SERVICE COMPANIES TO LIMIT HARMFUL CONTENT

212. As indicated by its title, the express purpose of the Communications Decency Act, 47 U.S.C. §230(c), is "[p]rotection [of] 'Good Samaritan' blocking and screening of offensive material."

213. The Act states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. §230(c).

214. The Act also asserts that providers or users may not be held liable for actions taken

52

"to restrict access to or availability of material" or to provide others with the means to "restrict access" to material "that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected." 47 U.S.C. §230(c)(2)(A).

215. Those provisions are intended to protect those attempting to restrict the deluge of harmful content on internet platforms and cannot possibly serve to shield Defendants from purposefully designing their social media platforms in ways that deliberately harm adolescents.

216. Plaintiff expressly disavows any claim or allegation that attempts to hold Defendants liable as the publisher or speaker of any information provided by third parties within the plain meaning of the Communications Decency Act and as interpreted by applicable law.

217. Plaintiff's claims stem from Defendants' actions of operating their platforms, which harm children, spawning the undeniable mental health crisis among America's youth.

218. The nature of Defendants' businesses centers around design choices to encourage users to spend excessive amounts of time on their platforms, disregarding the destructive effects that has on the well-being of young users. Plaintiff's claims are predicated on that conduct.

## IX. **CLAIMS FOR RELIEF**

### A. **COUNT ONE — PUBLIC NUISANCE**

219. Plaintiff repeats and incorporates the above allegations as if fully set forth herein.

220. A public nuisance is an unreasonable interference with a right common to the general public.

221. In addition, a public nuisance is behavior that unreasonably interferes with the health, safety, peace, comfort, or convenience of the general community.

222. Plaintiff and its students have a right to be free from conduct that endangers their health, comfort, and safety. Defendants have engaged in conduct that endangers or injures the

health, comfort, and safety of minors under the Plaintiff's care, by employing design and operational mechanisms that explicitly target tween and teenage children and knowingly place their wealth-building over the well-being of their young users.

223. Each Defendant has created or assisted in creating a condition injurious to the health, safety, peace, and comfort of the Plaintiff and its students, and thus interferes with the comfortable enjoyment of life and property within Plaintiff's community.

224. Defendants' conduct has caused increased mental health issues and a severe disruption of the public peace, order, and safety, including disruption of schools, classes, the learning environment, and the community at large. Defendants' conduct is ongoing and continues to produce permanent and long-lasting damage.

225. The health, comfort, and safety of the minors in Plaintiff's community, including those who use, have used, or will use Defendants' social media platforms, as well as those affected by users of these social media platforms, are matters of substantial public interest and of legitimate concern to Plaintiff.

226. Defendants' conduct has impacted and continues to impact the Plaintiff and is likely to continue causing significant harm to Plaintiff and its students.

227. But for Defendants' actions, there is no doubt that mental health issues in minors would not be as widespread as they are today, and the massive epidemic of youth and teen depression, anxiety, and self-harm that currently exists would have been averted.

228. Logic, common sense, justice, policy, and precedent indicate Defendants' conduct caused the damage and harm complained of herein. Defendants knew or reasonably should have known that their behavior regarding the risks and benefits that the use of Defendants' said platforms were causing harm. Thus, the public nuisance caused by Defendants to the Plaintiff was reasonably foreseeable, including the financial and economic losses incurred by Plaintiff.

229. Defendants' actions were, at the very least, a substantial factor in the youth mental health epidemic and in the public health crisis that has swept the country negatively impacting communities and schools, including in that of the Plaintiff.

230. Defendants' conduct in creating and maintaining the public nuisance were neither fully regulated nor required by any federal or Pennsylvania law.

231. The public nuisance alleged herein can be abated and further recurrence of such harm and inconvenience can be abated.

232. Defendants have unreasonably endangered and injured the public health and interfered with the public's right to be free from social media platforms targeting and addicting minors and to be knowledgeable concerning the dangers to minors of the use of Defendants' platforms.

233. Plaintiff has been and continues to be, directly and proximately injured by Defendants' actions in creating a public nuisance.

234. Plaintiff suffered special injuries distinguishable from those suffered by the general public.

235. Defendants have irreparably damaged the public health and the general welfare of the Plaintiff's students and their families and have thereby wrongfully caused the Old Forge School District to incur costs to support public health and welfare, thereby combating the harms caused by Defendants' misconduct.

236. Defendants' conduct was accompanied by wanton, willful, and reckless disregard of persons who foreseeably might be harmed by their acts and omissions.

237. Unless Defendants are enjoined and restrained from continuing their harmful activities and ordered to take affirmative steps to undo and abate the harm and confusion caused by Defendants' conduct, the unreasonable endangerment of the public health as described above

will continue, for which the Old Forge School District has no adequate remedy at law.

238. The public nuisance created and perpetuated by the Defendants must be abated. Abatement is defined as "[t]he removal, stoppage or destruction by any reasonable means of the cause or constitution of a public nuisance." 11 Pa. C. S. A.§ 127A01.

239. As a direct and foreseeable result of Defendants' public nuisance, the Plaintiff has paid and will be required to continue paying for ongoing youth mental health services to combat the results of Defendants' unlawful conduct, in addition to increased costs for mental health and other services for the youth affected. Accordingly, Plaintiff is entitled to compensatory damages and injunctive relief in the form of an abatement.

### B.    COUNT TWO — NEGLIGENCE

240. Plaintiff repeats and incorporates the above allegations as if fully set forth herein.

241. Each Defendant failed to act as a reasonably prudent person would under circumstances where they were offering Social Media platforms to children.

242. Each Defendant owed a duty of care to minors and to Plaintiff, for one because each Defendant knew or foreseeably should have known that its conduct in designing, setting up, promoting, managing, and operating its social media platforms as such would inflict severe mental harms on minors, including young residents of local communities throughout the country, which Old Forge School District would have to address.

243. Each Defendant also owed a duty to advertise their social media platforms in a truthful and non-misleading way and to monitor and report suspicious behavior or harmful activities.

244. Defendants further had a duty to provide accurate, true, and correct information about the risks of minors using Defendants' social media platforms, and appropriate, complete, and accurate warnings about the potential adverse effects of extended social media use, in

56

particular, the social media content Defendants' algorithms directed specifically at minor users.

245. Each Defendant has breached, and continues to breach, its duties of care owed to minors and to Plaintiff through its affirmative malfeasance, actions, business decisions, and policies in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective platforms.

246. As alleged above, each Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Defendants' platforms, specifically the addictive, compulsive, and repetitive use of those platforms, which foreseeably can lead to a cascade of negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, damage to body image and self-worth, increased risk behavior, exposure to predators, sexual exploitation, suicidal ideation, and profound mental health issues for minors, including but not limited to depression, body dysmorphia, anxiety, suicidal ideation, self-harm, insomnia, eating disorders, death, and other harmful effects.

247. Each Defendant also knew or, in the exercise of reasonable care, should have known that parents and minor users of Defendants' social media platforms were unaware of the risks and the magnitude of the risks associated with the use of the platforms, including but not limited to the risks of extended social media use and the likelihood that algorithm-based recommendations would expose adolescent users to content that is violent, sexual, or encourages self-harm, among other harmful behaviors.

248. Each Defendant further knew or, in the exercise of the reasonable care, should have known that their conduct violated the duty of care to minors and to Plaintiff, including providing true and correct information concerning the risks of using Defendants' platforms and appropriate, complete, and accurate warnings concerning the potential adverse effects of using the social media platforms.

57

249. Each Defendant also knew or, in the exercise of the reasonable care, should have known that their conduct could be remedied and abated.

250. Defendants, by action and inaction, representation, and omission, breached their duties of reasonable care, failed to exercise ordinary care, and failed to act as reasonably careful persons and/or companies would act under the circumstances in the design, research, development, testing, marketing, supply, promotion, advertisement, operation, and distribution of their social media platforms, in that Defendants designed, researched, developed, tested, marketed, supplied, promoted, advertised, operated, and distributed social media platforms that Defendants knew or had reason to know would negatively impact the mental health of minor users, and failed to prevent or adequately warn of these risks and injuries.

251. As a direct and proximate cause of each Defendant's unreasonable and negligent conduct, Plaintiff has suffered and will continue to suffer harm, and is entitled to damages in an amount determined at trial.

252. Defendants consciously chose not to inform the public, including the Plaintiff and its students, knowing unequivocally their platforms and functionality were harming minors.

## X.    REQUEST FOR RELIEF

WHEREFORE, the Plaintiff, Old Forge School District demands judgment against the Defendants and respectfully requests the Court issue the following Order:

A.    Adjudging and decreeing that Defendants' acts created, or were a substantial factor in creating, a public nuisance;

B.    Declaring that Defendants' conduct was and continues to be negligent;

C.    Awarding Plaintiff actual, compensatory, statutory and punitive damages, and any additional damages, penalties, and/or other monetary relief provided by applicable law;

D.    Awarding Plaintiff prejudgment and post-judgment interest as provided by law, and that

such be awarded at the highest legal rate from and after service of this Complaint;

E.    Ordering injunctive and other equitable relief as necessary to protect the interests of Plaintiff and its students;

F.    Ordering Defendants to pay Plaintiff's costs of this suit, including reasonable attorney fees; and

G.    Issuing any other relief that the Court deems just and proper.

## XI.    JURY TRIAL DEMANDED

Plaintiff further requests a jury trial on all claims so triable, as prescribed by Rule 38 of the Federal Rules of Civil Procedure.

DATED: 3-5-2026 ~~[illegible]~~

Respectfully submitted,

Richard J. Rinaldi, Esquire (ID: 233396)
312 Tulip Circle
Clarks Summit, PA 18411
Tel: (570) 780-6880
richard@rjrlaw.co

David Solfanelli, Esquire (ID: 93040)
Kelley, Polishan & Solfanelli, LLC
259 S. Keyser Ave.
Old Forge, PA 18518
Tel: (570) 562-4520 ext. 109
Fax: (570) 562-4531
dsolfanelli@kpswlaw.com

*Counsel for Plaintiff*

**TABLE OF CONTENTS**

I.      NATURE OF THE ACTION ................................................................................................ 1

II.     JURISDICTION AND VENUE ......................................................................................... 6

III.    PARTIES ............................................................................................................................. 7

        A.      Plaintiff .................................................................................................................... 7
        B.      Meta Defendants ..................................................................................................... 7
        C.      Snap Defendant ....................................................................................................... 9
        D.      TikTok Defendants ................................................................................................. 9
        E.      YouTube Defendants ............................................................................................ 10

IV.     FACTUAL BACKGROUND ......................................................................................... 11

        A.      The Design and Operation of Meta's Social Media Platforms are Purposefully
                Manipulative and Addictive ................................................................................. 12

                1.      Meta's Facebook is Purposefully Manipulative and Addictive ............. 14

                2.      Meta's Instagram Platform is Purposely Manipulative and Addictive ......... 20
        B.      YouTube's Design is Purposefully Manipulative and Addictive ...................... 25
        C.      Snapchat's Design Is Purposefully Manipulative and Addictive ...................... 28
        D.      TikTok's Design is Purposefully Manipulative and Addictive ........................ 32

V.      DEFENDANTS' PLATFORMS ARE DESIGNED TO MAXIMIZE YOUNG USERS'
        SCREEN TIME AND TRIGGER ADDICTION ............................................................ 36

VI.     DEFENDANTS PURPOSELY EMPLOY DESIGNS THAT ADDICT MINORS TO
        THEIR PLATFORMS ...................................................................................................... 39

VII.    DEFENDANTS' PLATFORMS HARM THEIR  MINOR USERS ............................... 42

        A.      Defendants Promote and Cause Increased Usage of Their Platforms by Minors ...... 42
        B.      Minors' Brains are Particularly Susceptible to Manipulation by Defendants ........... 45
        C.      Defendants' Conduct Harmed and Continues to Harm Old Forge School District ... 49

VIII.   THE COMMUNICATIONS DECENCY ACT ALLOWS COMPUTER SERVICE
        COMPANIES TO LIMIT HARMFUL CONTENT .......................................................... 52

IX.     CLAIMS FOR RELIEF ................................................................................................... 53

        A.      COUNT ONE — PUBLIC NUISANCE ............................................................. 53
        B.      COUNT TWO — NEGLIGENCE ....................................................................... 56

X.      REQUEST FOR RELIEF ................................................................................................ 58

XI.     JURY TRIAL DEMANDED ........................................................................................... 59